## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| **MANDY TAFT,** | **MEMORANDUM DECISION AND ORDER** |
| **Plaintiff,** | |
| **v.** | |
| **UTAH DEPARTMENT OF AGRICULTURE AND FOOD; and LOGAN WILDE, in his official and individual capacities,** | **Case No. 2:21-cv-00289-JCB** |
| **Defendants.** | **Magistrate Judge Jared C. Bennett** |

Under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, all parties have consented to Judge

Jared C. Bennett conducting all proceedings in this case, including entry of final judgment.[1]

Before the court is Defendants Utah Department of Agriculture and Food ("Department") and

Logan Wilde's ("Mr. Wilde") (collectively, "Defendants") motion for summary judgment.[2] The

court held oral argument on the motion on July 21, 2022.[3] After carefully reviewing the parties'

written and oral arguments, the court grants in part and denies in part Defendants' motion.

---

[1] ECF No. 9.

[2] ECF No. 13.

[3] ECF No. 21.

**UNDISPUTED FACTS**[4]

Plaintiff Mandy Taft ("Ms. Taft") earned a Bachelor of Science degree in business management from Westminster College in 2017[5] and had several years of management, administrative, and accounting experience in various jobs.[6] In September 2019, she began working as the Director of Administrative Services ("DAS") for the Department.[7] The DAS supervises many divisions in the Department including finance, risk management, fleet, travel, payables, grants, and budgets.[8] The DAS serves at the pleasure of the Commissioner of the Department, who is appointed by the Governor of the State of Utah and confirmed by advice and consent from the Utah State Senate.[9]

In January 2020, fiscal analysts from the Utah Legislature[10] met with Ms. Taft and others from the Department to discuss the use of $900,000 that the Utah Legislature had previously

---

[4] Where, as here, the court is not granting "all the relief requested by the motion [for summary judgment]," the following undisputed facts are deemed "established in the case" for purposes of trial. Fed. R. Civ. P. 56(g).

[5] ECF No. 13-1 at 8-9 of 94. The court will use the page numbers generated by the CM/ECF system to avoid confusion with all the different pagination systems that are found on the parties' summary judgment memoranda and related exhibits.

[6] ECF No. 16-1 at 2-3 of 9.

[7] ECF No. 13-1 at 10, 13 of 94. While serving as the DAS, Ms. Taft began working toward a Master of Business Administration, which she completed in 2021 after she was terminated as the DAS. *Id.* at 9 of 94.

[8] *Id.* at 14 of 94.

[9] ECF No. 13-2 at 12-13 of 138; ECF No. 13-3 at 29, 32-33 of 96.

[10] ECF No. 13-2 at 20 of 138.

appropriated to the Department to acquire new computers.[11] At that meeting, one of Ms. Taft's

subordinates, Debbie Lyberger ("Ms. Lyberger"), stated that she had transferred the $900,000

from one line item to another without proper authorization, and, consequently, the appropriated

funds were used for some other purpose than computers.[12] Ms. Taft learned about Ms. Lyberger's

unauthorized action at this January 2020 meeting.[13]

      In March 2020, the Governor of Utah appointed Mr. Wilde to take over for the

Department's Commissioner who had hired Ms. Taft.[14] After taking office, Mr. Wilde received a

visit from the Governor's Chief of Staff who expressed concerns with how Ms. Taft and her staff

were handling monthly reports and because the Department had exceeded its budget in the

past.[15] In early 2020, the State Auditor began an investigation of the Department, which included

---

[11] ECF No. 13-1 at 27-28, 34 of 94; ECF No. 13-3 at 74 of 96.

[12] ECF No. 13-1 at 26 of 94; ECF No. 13-3 at 39-40, 74-75 of 96; ECF No. 16-2.

[13] ECF No. 13-1 at 54 of 94.

[14] ECF No. 13-2 at 10 of 138.

[15] *Id.* at 49-50 of 138. Ms. Taft objects to the admissibility of this fact as hearsay under Fed. R. Evid. 802. "Hearsay" is an out-of-court statement that "a party offers in evidence to prove the truth of the matter asserted in the statement," Fed. R. Evid. 801(c)(2), and "cannot be considered on a motion for summary judgment" unless an exception applies. *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994). Ms. Taft argues that what the Governor's Chief of Staff said to Mr. Wilde constitutes an out-of-court statement that Defendants offer for the truth of the matter asserted (i.e., that Ms. Taft was mishandling reports and budgeting). Because there is no exception for this statement, Ms. Taft argues, it is inadmissible hearsay. ECF No. 16 at 5-6 of 25. However, the court receives the Chief of Staff's statements not for their literal truth but to explain why Ms. Taft's qualifications were included in an investigation of the Department that the State Auditor undertook shortly after Mr. Wilde became Commissioner. *United States v. Freeman*, 816 F.2d 558, 563 (10th Cir. 1987) ("[A]n out of court statement is not hearsay if it is offered for the limited purpose of explaining why a government investigation was undertaken." (quotations and citation omitted)); *accord United States v. Wilson*, 107 F.3d 774, 780-81 (10th

the actions of various Department managers, including Ms. Taft, from April 2019 to January 2020.[16] During this investigation, an employee from the State Auditor's Office interviewed Ms. Taft and told her that "[w]e have concerns about you being in the Director position with not [sic] financial background, while still in college."[17]

While the State Auditor's investigation of the Department was ongoing, around or shortly before early June 2020, Ms. Taft told Mr. Wilde about Ms. Lyberger's mishandling of the $900,000 in appropriated funds.[18] However, Mr. Wilde was already aware of Ms. Lyberger's actions prior to becoming the Commissioner of the Department.[19] Ms. Taft wanted to "write up" (i.e., discipline or reprimand) Ms. Lyberger for her misconduct, but Mr. Wilde opposed.[20] In fact,

---

Cir. 1997) (concluding that statements from law enforcement at trial about starting an investigation based on information that drugs were being sold at a particular residence was not hearsay when received for the purpose of explaining why the government undertook an investigation). Therefore, the Chief of Staff's statements are received for this limited purpose only and, consequently, are not hearsay.

[16] ECF No. 13-7 at 4-5 of 29.

[17] ECF No. 13-8 at 18 of 26. Ms. Taft objects to the inclusion of this fact based on double hearsay (i.e., Ms. Taft's out-of-court statement about what the State Auditor's Office employee said to her out of court). However, this is not double hearsay because Defendants submit Ms. Taft's out-of-court statement as an admission by a party opponent, which renders *her* out-of-court statement non-hearsay. Fed. R. Evid. 801(d)(2). But Ms. Taft's repetition of another out-of-court statement could be hearsay if Defendants submit it for the purpose of proving the truth of the matter asserted (i.e., that the State Auditor had concerns about her qualifications). However, this is not hearsay because it explains why the State Auditor investigated Ms. Taft's qualifications. *Freeman*, 816 F.2d at 563. Therefore, the court receives this statement for this limited purpose.

[18] ECF No. 13-1 at 34 of 94.

[19] ECF No. 13-2 at 111-112 of 138.

[20] ECF No. 13-1 at 34-35 of 94.

Mr. Wilde warned Ms. Taft that she could not reprimand Ms. Lyberger and, in so warning, reminded Ms. Taft that she was an "at-will employee."[21]

Nevertheless, on July 14, 2020, Ms. Taft issued Ms. Lyberger's performance review,[22] in which Ms. Taft gave Ms. Lyberger a rating of "Does Not Meet Expectations" for the "Budget" component of Ms. Lyberger's core duties due to her mishandling the $900,000 appropriation.[23] Sometime after July 14 but before Ms. Taft's termination on July 22, 2020, Mr. Wilde learned about Ms. Taft's unfavorable review of Ms. Lyberger's performance.[24] On or around July 21, 2020, Mr. Wilde began discussions with the Department's Human Resources Division regarding the termination of Ms. Taft's employment[25] even though Ms. Taft had received a "Successful" performance evaluation a mere 20 days earlier.[26]

On July 22, 2020, Mr. Wilde terminated Ms. Taft's employment.[27] The proffered reason for Ms. Taft's termination was that "Agency Leadership has chosen to move forward in another

---

[21] *Id*. at 35 of 94.

[22] ECF No. 16-3.

[23] ECF No. 13-8 at 15 of 26.

[24] ECF No. 13-4 at 2 of 3.

[25] ECF No. 13-2 at 46 of 138.

[26] ECF No. 16-11 at 1 of 4.

[27] ECF No. 13-9 at 2 of 2.

direction."[28] When Mr. Wilde met with Ms. Taft on the day of her termination, he offered to write her a letter of recommendation and told her, "I feel that your work is qualified."[29]

However, the process did not end there because a few days later, Ms. Taft's termination was suspended and changed to "administrative leave" while the Department engaged in further investigation.[30] After a three-week investigation, Mr. Wilde reissued the letter terminating Ms. Taft because "Agency Leadership has chosen to move forward in another direction."[31]

On November 17, 2020—nearly four months after Ms. Taft's initial termination—the State Auditor issued his final report reviewing "certain aspects of internal control and compliance at the [Department]."[32] Of the many conclusions in the report, the State Auditor found as to Ms. Taft:

> In August 2019, the Former Commissioner appointed the New Finance Director who did not have the necessary qualifications to perform the required duties. The New Finance Director was pursuing a Master's Degree [sic] in Business Administration but had insignificant experience or education in governmental accounting. Furthermore, the New Finance Director had insignificant professional management experience. Hiring managers should ensure individuals have the necessary knowledge, skills, and experience to perform required duties. Otherwise, lack of qualifications increases the risk of errors and improper financial reporting. Due to her lack of qualifications, the New Finance Director has since been terminated for non-performance. . . . [W]e

---

[28] *Id.*

[29] ECF No. 16-10 at 2 of 3.

[30] ECF No. 13-10 at 2 of 3.

[31] ECF No. 13-11 at 2 of 2.

[32] ECF No. 13-7 at 4 of 29.

conclude the New Finance Director did not have the knowledge and skills required to perform the job.[33]

On January 15, 2021, Ms. Taft filed this lawsuit in Utah's Third District Court.[34] In May 2021, that action was removed to this court.[35] Ms. Taft's complaint alleged three causes of action.[36] First, Ms. Taft pled a violation of the Utah Protection of Public Employees Act ("UPPEA")[37] against the Department.[38] Second, Ms. Taft asserted a breach of contract claim against the Department,[39] which she now abandons.[40] Finally, Ms. Taft alleged a claim under 42 U.S.C. § 1983 against both the Department and Mr. Wilde (in both his official and individual capacities).[41] However, Ms. Taft now abandons her section 1983 claims against the Department and Mr. Wilde in his official capacity.[42] Thus, only Ms. Taft's remaining claims against the

---

[33] *Id.* at 17-18 of 29 (footnote omitted). The court notes that Ms. Taft was not the "Finance Director" but the "Director of Administrative Services." This misnomer was a mistake by the State Auditor that may bear some significance that will be discussed later.

[34] ECF No. 3-1.

[35] ECF No. 2.

[36] ECF No. 3-1 at 9-13 of 14.

[37] Utah Code Ann. §§ 67-21-1 to 67-21-10.

[38] ECF No. 3-1 at 9-10 of 14.

[39] ECF No. 3-1 at 10-11 of 14.

[40] ECF No. 16 at 5 n.1 of 25.

[41] ECF No. 3-1 at 12-13 of 14.

[42] ECF No. 16 at 5 n.1 of 25.

Department under the UPPEA and against Mr. Wilde in his individual capacity are addressed further below.

## LEGAL STANDARDS

Under Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "A genuine issue of fact exists only where 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"[43] "Thus, the relevant inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"[44]

In evaluating a motion for summary judgment, the court "view[s] the facts in the light most favorable to the nonmovant and draw[s] all reasonable inferences in the nonmovant's favor."[45] "'The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.'"[46] If the movant does not bear the burden of proof at trial as to the claims for which it seeks summary

---

[43] *Carey v. U.S. Postal Serv.*, 812 F.2d 621, 623 (10th Cir. 1987) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[44] *Id.* (quoting *Anderson*, 477 U.S. at 251-52).

[45] *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015).

[46] *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016) (quoting *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007)).

judgment, then the movant "may make its prima facie demonstration by pointing out to the court a lack of evidence on an essential element of the nonmovant's claim."[47]

"If the movant meets this initial burden, the burden then shifts to the nonmovant to set forth specific facts from which a rational trier of fact could find for the nonmovant."[48] To satisfy its burden, "the nonmovant must identify facts 'by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein.'"[49] "These facts must establish, at a minimum, an inference of the presence of each element essential to the case."[50] Entry of summary judgment is required,

> after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is entitled to a judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof.[51]

---

[47] *Libertarian Party of N.M.*, 506 F.3d at 1309 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)); *see also Savant Homes, Inc.*, 809 F.3d at 1137.

[48] *Libertarian Party of N.M.*, 506 F.3d at 1309 (citing *Celotex Corp.*, 477 U.S. at 324) (quotations and other citations omitted); *see also Savant Homes, Inc.*, 809 F.3d at 1137.

[49] *Savant Homes, Inc.*, 809 F.3d at 1137 (quoting *Libertarian Party of N.M.*, 506 F.3d at 1309).

[50] *Id.* at 1137-38 (quotations and citations omitted).

[51] *Celotex Corp.*, 477 U.S. at 322-23 (quotations omitted).

<u>**ANALYSIS**</u>

Under the foregoing standards, the court addresses Ms. Taft's two remaining causes of action: (I) the UPPEA claim against the Department; and (II) the section 1983 claim against Mr. Wilde in his individual capacity. And, for the reasons stated below, the Department's summary judgment motion on Ms. Taft's UPPEA claim is denied while Mr. Wilde's summary judgment motion for the section 1983 claim is granted.

## I.   **The Department Is Not Entitled to Summary Judgment on Ms. Taft's UPPEA Claim.**

The Department's summary judgment motion fails as to Ms. Taft's UPPEA claim because Ms. Taft can establish a prima facie case of retaliation, and a reasonable factfinder could conclude that the Department's proffered reasons for terminating Ms. Taft were pretextual. The UPPEA precludes a government employer from retaliating against an employee who "communicates in good faith" about a "violation or suspected violation of a law, rule, or regulation adopted under the law of this state," among other things.[52] Statutes like the UPPEA that preclude retaliation against those who report government waste, fraud, or abuse are euphemistically known as "whistleblower" laws.[53]

---

[52] Utah Code Ann. § 67-21-3(1)(a)(ii).

[53] *See, e.g.*, S. Rep. No. 112-155, 1, 2012 U.S.C.C.A.N. 589, 589 (explaining that the Whistleblower Protection Enhancement Act of 2012 was intended to "strengthen the rights of and protections for federal whistleblowers so that they can more effectively help root out waste, fraud, and abuse in the federal government").

When analyzing *federal* whistleblower laws, courts have routinely adopted the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*.[54] The *McDonnell Douglas* framework "provides a principled mode for analyzing retaliatory intent," especially in cases where direct evidence of retaliation is not proffered.[55]

However, no state or federal court has adopted the *McDonnell Douglas* framework for claims under the UPPEA. Nevertheless, the parties in this action operate under the assumption that this court should apply the *McDonnell Douglas* framework because Ms. Taft has not shown any direct evidence of retaliation.[56] The court notes that amendments to the UPPEA—albeit after Ms. Taft's termination—now require courts to employ the *McDonnell Douglas* framework for UPPEA claims.[57] Thus, given the ample authority for employing the *McDonnell Douglas* framework to whistleblower statutes similar to the UPPEA, the parties' acknowledgment of the framework's utility to the UPPEA claim at issue here, and the Utah Legislature's use of that framework in its recent UPPEA amendments, the court applies the *McDonnell Douglas* framework to Ms. Taft's UPPEA claim.

---

[54] 411 U.S. 792, 802-03 (1973); *see, e.g.*, *Miller v. Inst. for Def. Analyses*, 795 F. App'x 590, 595 & n.6 (10th Cir. 2019) (adopting *McDonnell Douglas* framework for False Claims Act retaliation claims).

[55] *Harrington v. Aggregate Indus. Ne. Region, Inc.*, 668 F.3d 25, 30-31 (1st Cir. 2012).

[56] Oral Argument Tr. at 7:12-13 (Ms. Taft's counsel stating that *McDonnell Douglas* framework applies to UPPEA claim); 10:4-10 (Defendants' counsel agreeing that *McDonnell Douglas* framework applies to UPPEA claim).

[57] Utah Code Ann. § 67-21-4(3).

The familiar *McDonnell Douglas* framework consists of three parts. First, "'a plaintiff first must set forth a prima facie case of retaliation.'"[58] Second, if the plaintiff can establish a prima facie case, "'the burden then shifts to the defendant to articulate a legitimate, nonretaliatory reason for the adverse employment action.'"[59] Finally, "'[i]f the employer produces evidence of a legitimate nonretaliatory reason, the plaintiff must assume the further burden of showing that the proffered reason is a pretext calculated to mask retaliation.'"[60] As shown in order below, (A) Ms. Taft has established a prima facie case; (B) the Department has produced evidence of a legitimate, nonretaliatory reason; and (C) a reasonable factfinder could conclude that Ms. Taft has made a sufficient showing that the Department's proffered reason is pretext for retaliation.

### A.    Ms. Taft Has Established a Prima Facie Case of Retaliation.

Ms. Taft has established a prima facie case of retaliation because she engaged in protected activity and suffered an adverse employment action that was sufficiently proximate to the protected activity to infer a causal connection. "A plaintiff proves a prima facie case of [UPPEA] retaliation by showing (1) the employee engaged in protected activity, (2) the employer . . . knew about the protected activity, and (3) retaliation [occurred] because of [her] protected activity."[61] The Department disputes whether Ms. Taft engaged in protected activity under the

---

[58] *Miller*, 795 F. App'x at 595 (quoting *Harrington*, 668 F.3d at 31).

[59] *Id.* (quoting *Harrington*, 668 F.3d at 31).

[60] *Id.* (quoting *Harrington*, 668 F.3d at 31).

[61] *Id.* (second alteration in original) (quotations and citation omitted).

UPPEA by reporting Ms. Lyberger's misconduct in her performance review.[62] But, the Department concedes that *if* Ms. Taft's written performance evaluation of Ms. Lyberger is protected conduct, then Mr. Wilde knew about it, and the protected activity in this case was sufficiently proximate to the act of alleged retaliation (i.e., termination from employment) to establish causation for purposes of a prima facie case.[63] Accordingly, whether Ms. Taft has established a prima facie case comes down to whether reporting Ms. Lyberger's misconduct in her performance review is protected activity.

Ms. Taft's adverse employment evaluation of Ms. Lyberger is protected activity under the UPPEA. The UPPEA provides that "[a]n employer may not take retaliatory action against an employee because the employee . . . communicates in good faith . . . a violation or suspected violation of a law, rule, or regulation adopted under the law of this state."[64] As in all cases

---

[62] Oral Argument Tr. at 45:21-23.

[63] Oral Argument Tr. at 35:19-25 (acknowledging that Mr. Wilde was aware of Ms. Taft's performance review of Ms. Lyberger); 45:4-10 (acknowledging that if Ms. Taft's adverse performance review of Ms. Lyberger is protected activity then the adverse employment action against Ms. Taft was sufficiently proximate to meet the causation element of a prima facie case). Absent these professionally candid concessions from counsel, the record clearly establishes the second and third elements of a prima facie case. Mr. Wilde clearly was aware that Ms. Taft had issued an adverse performance review of Ms. Lyberger *before* he terminated Ms. Taft's employment. ECF No. 13-4 at 2 of 3. And, Ms. Taft's adverse evaluation of Ms. Lyberger occurred eight days before Mr. Wilde terminated Ms. Taft. *Compare* ECF No. 16-3, *with* ECF No. 13-9 at 2 of 2. This short time span is sufficiently proximate for purposes of causation to establish a prima facie case as a matter of law. *See, e.g.*, *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1228 (10th Cir. 2008) (finding that less than two weeks between protected conduct and adverse action "is alone sufficient to establish a causal connection" to meet a prima facie case of retaliation).

[64] Utah Code Ann. § 67-21-3(1)(a)(ii).

requiring statutory construction, the court "begin[s] with the plain language of the law."[65] According to the plain language of the UPPEA, the "protected activity" occurs when: (1) "an employee" (2) "communicates" (3) "in good faith" (4) "a violation or suspected violation of law, rule, or regulation." Both parties agree that Ms. Taft was an "employee" under the UPPEA[66] and reported a violation of state law (i.e., the misuse of the Utah Legislature's appropriation to the Department to purchase computers). Additionally, neither party contends that Ms. Taft's report of Ms. Lyberger's misconduct was not done in good faith. Thus, if Ms. Taft's performance appraisal of Ms. Lyberger "communicates" under the UPPEA, then Ms. Taft has established a prima facie case.

Ms. Taft's performance appraisal documenting Ms. Lyberger's misconduct "communicates" under the UPPEA and, therefore, is protected activity for purposes of establishing a prima facie case. At first blush, the UPPEA's use of verb "communicates" in Utah Code Ann. § 67-21-3(1)(a) appears to be intransitive. In other words, section 67-21-3(1)(a) does not require the employee to communicate the alleged violation *to* anyone. This omission appears purposeful because Utah Code Ann. § 67-21-3(1)(b) states that an employee is presumed to have acted in good faith "if the employee gives written notice or otherwise formally communicates the [illicit] conduct . . . *to*" various enumerated government officials.[67] Given this dual use of the

---

[65] *United States v. Morgan*, 922 F.2d 1495, 1496 (10th Cir. 1991).

[66] The UPPEA defines "employee" as "a person who performs a service for wages or other remuneration under a contract of hire, written or oral, express or implied." Utah Code Ann. § 67-21-2(4).

[67] (Emphasis added).

verb "communicate" in both its transitive and intransitive form in sections 67-21-3(1)(b) and 67-21-3(1)(a) respectively, one may be tempted to assume that "communicates" in section 67-21-3(1)(a) does not require the employee to report the alleged misconduct to anyone because the Legislature clearly knows how to require a communication "to" someone when it so desires. Thus, it appears at first blush that the Legislature did not intend that the communication be transmitted to anyone in order to be protected activity.

However, where, as here, "a statute includes an explicit definition of a term, [the court] must follow that definition, even if it varies from a term's ordinary meaning."[68] The UPPEA defines "communicate" as "a verbal, written, broadcast, or other *communicated* report."[69] Using "communicated" to define "communicate" sets up a tautology, which provides little help in determining the meaning of the defined term. Consequently, the court must use other intrinsic construction aids to determine the meaning of "communicates" under the UPPEA. One such intrinsic construction aid is the doctrine of *noscitur a sociis*. The "commonsense canon of *noscitur a sociis* . . . counsels that a word is given more precise content by the neighboring words with which it is associated."[70]

The series of words in the definition of "communicate" militate in favor of the notion that "communicates" in section 67-21-3(1)(a) is used as a transitive verb that requires the employee to tell someone else about the misconduct. For example, a "verbal" communication means little

---

[68] *Van Buren v. United States*, 141 S. Ct. 1648, 1657 (2021) (quotations and citation omitted).

[69] Utah Code Ann. § 67-21-2(2) (emphasis added).

[70] *United States v. Williams*, 553 U.S. 285, 294 (2008).

unless there is someone else to hear it. Although a "written" communication may be placed in a file that no one else will read, that meaning of "written" must keep company with its neighbors "verbal" and "broadcast," which, by definition require transmission of information to someone else.[71] Finally, the term "*communicated* report," given the meaning of its neighbors, should be interpreted to require transmission of information in the "report" to another person. Thus, under the UPPEA, to communicate, the employee must transmit the information about the alleged legal violation to someone else.

But the UPPEA does not specify who that "someone else" must be in order to meet the definition of "communicate" in section 67-21-3(1)(a). Indeed, neither section 67-21-3(1)(a) nor section 67-21-3(1)(b) specifies to whom the employee *must* transmit information about a possible legal violation. Instead, section 67-21-3(1)(b) merely presumes good faith if the employee provides information of potential wrongdoing to one of the government officials specified in that section; it does not *require* the employee to transmit that information to those listed officials to constitute a communication under the UPPEA. Therefore, "communicates" under the UPPEA merely requires an employee to transmit information about a possible legal violation to someone else.

Although "communicates" under the UPPEA requires the transmission of information to someone else, the form in which this transmission must occur is exceedingly broad. For starters,

---

[71] *Broadcast*, oed.com,
https://www.oed.com/search?searchType=dictionary&q=broadcast&_searchBtn=Search (last visited Aug. 18, 2022).

section 67-21-3 itself does not specify the format of the communication.[72] And the UPPEA's definition of the term "communicate" employs the broad terms of a "verbal, written, broadcast, or other communicated report."[73] Thus, neither section 67-21-3 itself nor the definition of "communicate" imposes any specific forms or formalities that an employee must follow to report misconduct. Accordingly, under the plain language of the UPPEA's concessive reporting requirements, an employee "communicates" by transmitting information about illicit conduct to someone else in a verbal, written, broadcast, or other form.

Given this plain language interpretation of "communicates" under section 67-21-3(1)(a), Ms. Taft's written performance review of Ms. Lyberger's misconduct meets the UPPEA's requirements to be protected activity for purposes of establishing a prima facie case. Ms. Taft reported Ms. Lyberger's budgetary misconduct in a *written* employment performance review. Not only was this misconduct shared with Ms. Lyberger, but it was also shared with others, including Mr. Wilde who, shortly thereafter, decided to terminate Ms. Taft's employment. Therefore, Ms. Taft's written review of Ms. Lyberger meets the definition of "communicates" under section 67-21-3(1)(a).

Despite the foregoing, the Department contends that Ms. Taft's adverse employment review of Ms. Lyberger is not a protected communication under the UPPEA for two reasons. First, the Department argues that Ms. Taft's performance review of Ms. Lyberger is not a protected communication because Ms. Lyber's misconduct was already known, and, therefore,

---

[72] Utah Code Ann. § 67-21-3(1)(a).

[73] Utah Code Ann. § 67-21-2(2).

Ms. Taft was not the first to disclose the problem.[74] Second, the Department asserts that employee performance reviews are not the type of reports that the UPPEA contemplates as qualifying for whistleblower protection.[75] Neither argument is persuasive.

The Department's insistence on a "first to report" requirement fails because the Utah Legislature never included it in UPPEA. As a general matter, Utah courts—including this one— must "presume that the language chosen by the Legislature is meaningful," and, therefore, courts "will not infer substantive terms into the text that are not already there. Rather, the interpretation [of a statute] must be based on the language used, and [courts have] no power to rewrite the statute to conform to an intention not expressed."[76] Additionally, as applied to statutes like the UPPEA, "history teaches courts not to routinely read 'first to report' requirements into whistleblower statutes."[77] Indeed, the court is not going to add a "first to report" requirement to a statute that the Utah Legislature did not deem fit to include.

Because the Department has no statutory text on which to hang its argument, it claims that not imposing a "first to report" requirement will lead to absurd results, which will "open the floodgates to allow almost anyone to become a whistleblower."[78] However, the bar that the Utah

---

[74] ECF No. 13 at 16-17 of 29 (stating that Ms. Taft is not a whistleblower because "she was not the one that 'raised the red flag' on the issue"); ECF No. 19 at 8-9.

[75] ECF No. 13 at 17 of 29 ("Writing up an employee so that her misconduct is in her personnel file cannot be what the legislature intended when it drafted the UPPEA.").

[76] N. Monticello All., LLC v. San Juan Cnty., 506 P.3d 593, 602 (Utah 2022) (first alteration in original) (quotations and citation omitted)

[77] Morohan v. BNSF Ry., 14CV305, 2016 WL 7426581, at *4 (S.D. Iowa May 11, 2016).

[78] ECF No. 19 at 9.

Supreme Court has set for showing that a statute will lead to absurd results is far too high for the Department to meet. Specifically, the Utah Supreme Court "will not apply the absurdity doctrine unless the operation of the plain language . . . [is] so overwhelmingly absurd that *no rational legislator* could have intended the statute to operate in such a manner."[79]

A rational legislator could have intended to leave out a "first to report" requirement because, as this case shows, just because a supervisor knows of misconduct, nothing may happen to rectify or to hold the wrongdoer accountable for it. Mr. Wilde did not want Ms. Taft to take *any* adverse action against Ms. Lyberger for misappropriating $900,000 of taxpayer funds that the Utah Legislature entrusted to the Department. Applying a "first to report" rule would allow a supervisor who knows of misconduct but does nothing about it to engage in retaliation against an employee for reporting the misconduct simply because the reporting employee was not the first. Consequently, it is not only easy to see why the Utah Legislature never included a "first to report" requirement in the UPPEA but also why many jurisdictions that had such a requirement have since rejected it.[80] Therefore, a rational legislator could have intended the UPPEA to function as written: without a "first to report" requirement.[81]

---

[79] *Bagley v. Bagley*, 387 P.3d 1000, 1010 (Utah 2016) (alterations in original) (emphasis added).

[80] *Monohon*, 2016 WL 7426581, at *4 n.3 (listing the jurisdictions that have excised the "first to report" requirement in their various whistleblower statutes or have amended whistleblower statutes where courts have read such a requirement into the statute).

[81] Although the court finds that a "first to report" requirement is not present in the UPPEA, the court agrees with the Department that there is a limit as to when the information becomes so well known that communicating that information may cease to be protected. However, the element of a whistleblower claim under which such an issue could be addressed is "good faith." Indeed, the UPPEA defines "good faith" as the reporting employee acting with "subjective good faith" and "the objective good faith of a reasonable employee." Utah Code Ann. § 67-21-2(6)(a)-(b). If

The Department's second counterargument fares no better than its first. The UPPEA imposes no form, restrictions, or requirements regarding how an employee must "communicate" illicit conduct. The only reporting requirement is that the report of misconduct be "verbal, written, broadcast, or other communicated report."[82] Nothing is this broad definition precludes an employee performance review from serving as the written report. Indeed, by arguing that an employee performance review cannot "communicate" misconduct under the UPPEA, the Department asks this court to invoke what the United States Supreme Court has called the "donut hole" canon of statutory construction.[83] The "donut hole" canon posits that the legislative branch's "failure to speak directly to a specific case that falls within a more general statutory rule creates a tacit exception."[84] However, the Supreme Court has rejected this approach because when the legislative branch "chooses not to include any exceptions to a broad rule, courts apply the broad rule."[85] Here, the court must adopt the broad rule of "communicate" under the UPPEA,

---

alleged misconduct was so well known that the employee's reporting manifests an intent to hinder, delay, or harass under the circumstances of a case, then the employee's report would not be protected under the UPPEA. *Boyer v. Boyer*, 183 P.3d 1068, 1073 (Utah Ct. App. 2008) (stating that "good faith" is making a claim with "an honest belief that it is appropriate and as long as there is no intent to hinder, delay, defraud, or take advantage of the other party"). Thus, the subjective and objective good faith requirements prevent the opening of the floodgates of whistleblower litigation. Here, however, no party disputes that Ms. Taft had both an objective and subjective good faith belief that Ms. Lyberger committed reportable misconduct and that Ms. Taft was seeking to hold Ms. Lyberger accountable, which is what Ms. Taft was allowed to do as Ms. Lyberger's supervisor. Therefore, Ms. Taft's good faith is not an issue in this action.

[82] Utah Code Ann. § 67-21-2(2).

[83] *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1747 (2020).

[84] *Id.*

[85] *Id.*

which does not preclude an employee performance review from being the vehicle in which a report of misconduct is delivered. Because the Utah Legislature did not create any exceptions to the broad rule, this court will not either. Consequently, Ms. Taft's employee performance review of Ms. Lyberger meets the definition of "communicate" under the UPPEA and, therefore, is protected activity for purposes of establishing a prima facie case of retaliation. Given that Ms. Taft's performance review of Ms. Lyberger is protected activity, and the Department agrees that Ms. Taft can establish the remaining elements of a prima facie case, the court concludes that Ms. Taft has established a prima facie case and, therefore, now turns to whether the Department can proffer a legitimate, non-retaliatory basis for terminating Ms. Taft's employment.

## B. The Department Has Proffered a Legitimate, Non-Retaliatory Reason for Terminating Ms. Taft's Employment.

Given that Ms. Taft has carried her initial burden to establish a prima facie case, the Department must proffer a legitimate, non-retaliatory reason for terminating Ms. Taft's employment.[86] The Department asserts that Mr. Wilde terminated Ms. Taft's employment, not in retaliation for Ms. Taft's protected activity, but because she was not qualified to serve as the DAS.[87] Terminating an employee for not being qualified is a legitimate, non-retaliatory reason.[88]

---

[86] *Miller*, 795 F. App'x at 595.

[87] ECF No. 13 at 18-20 of 29.

[88] *See, e.g.*, *Patrick v. Principi*, 275 F.3d 44, No. 01-50319, 2001 WL 1223858, at *6 (5th Cir. 2001) (per curiam) ("The Secretary asserts a legitimate, nonretaliatory reason for the NPSB's employment decision, i.e., that Patrick was not promoted to Nurse III because she was not qualified for the position.").

Therefore, the Department has met its burden, and Ms. Taft must now establish that the Department's proffered reason for terminating her employment is pretext for retaliation.[89]

### C.      A Reasonable Factfinder Could Conclude That Ms. Taft Was Terminated Based on Retaliation for Engaging in Protected Activity.

At this stage in the litigation, Ms. Taft has produced sufficient evidence for a reasonable factfinder to conclude that the Department's explanation is pretext for retaliation. "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-[retaliatory] reasons."[90] "In determining whether the proffered reason for a decision was pretextual, we examine the facts as they appear to the person making the decision[,] not the plaintiff's subjective evaluation of the situation."[91] Thus, "[t]he relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs."[92]

Based on the record before the court, a reasonable factfinder could conclude that the Department's proffered reason is pretext for retaliation for two reasons. First, a reasonable factfinder could determine that the explanation that the Department offers in this litigation for terminating Ms. Taft's employment is substantially different than the reason it provided to Ms.

---

[89] *Miller*, 795 F. App'x at 595.

[90] *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quotations and citations omitted).

[91] *Luster v. Vilsack*, 667 F.3d 1089, 1093 (10th Cir. 2011) (quotations, citation, and emphasis omitted).

[92] *Id.* at 1094 (quotations and citation omitted).

Taft at the time of her termination. Second, the Department gave Ms. Taft a successful performance review shortly before her employment was terminated, which, under the circumstances of this case, could further demonstrate to a reasonable factfinder that the Department's proffered reason lacks credibility. Each reason is discussed in order below.

1. **The Department's Changed Explanation for Terminating Ms. Taft's Employment Is Sufficient for a Reasonable Factfinder to Conclude That Retaliation Was the Motivation.**

A reasonable factfinder could conclude that the Department's changing reasons for terminating Ms. Taft's employment demonstrates retaliation. "Post-hoc justifications for termination constitute evidence of pretext."[93] The Department's argument that it terminated Ms. Taft based on her lack of qualifications is not the same reason it twice provided to Ms. Taft. On July 22, 2020, Mr. Wilde issued a letter to Ms. Taft informing her that she had been terminated because "Agency Leadership has chosen to move forward in another direction."[94] A short time later, the Department rescinded Ms. Taft's termination and undertook an investigation that lasted approximately three weeks only to conclude again that Ms. Taft should be terminated because "Agency Leadership has chosen to move forward in another direction."[95] Thus, even with the benefit of further investigation, the Department's explanation did not even hint a terminating Ms. Taft for lacking qualifications but based on a need for "another direction."

---

[93] *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1059 (10th Cir. 2020).

[94] ECF No. 13-9 at 2 of 2.

[95] ECF No. 13-11 at 2 of 2.

A reasonable factfinder could determine that this discrepancy is evidence of pretext especially because of Ms. Taft's status as a Schedule A employee, which, by definition, is an employee who served at the pleasure of a politically appointed official. As a politically appointed Commissioner, Mr. Wilde could terminate all the existing Schedule A employees merely because they were hired by the previous politically appointed Commissioner, and Mr. Wilde wanted his people in the Department instead of his predecessor's. In fact, Mr. Wilde mentioned that his predecessor had done just that when he became the Commissioner.[96] Terminating the prior Commissioner's Schedule A employees and inserting one's own would be the epitome of going "in another direction." However, claiming that an employee was terminated for want of qualifications is very distinct from a mere directional change under these circumstances. The fact that the Department had a chance to investigate Ms. Taft's termination and still failed to mention *anything* about her lack of qualifications in the final decision to terminate her employment could be evidence on which a factfinder relies to support a finding of pretext.

In response, the Department cites to the State Auditor's report, which concluded that Ms. Taft lacked qualifications to serve as the DAS. However, relying on this report only makes things worse for the Department vis-à-vis a reasonable factfinder. For starters, the State Auditor's report was produced approximately three months *after* Ms. Taft's employment had been terminated, which makes it a post-hoc explanation that, as explained above, contradicts the contemporaneous reasons that Mr. Wilde provided twice to Ms. Taft even after the Department engaged in further investigation.

---

[96] ECF No. 13-2 at 13 of 38.

Moreover, a reasonable factfinder's review of some odd errors in the State Auditor's report could also lead to a conclusion that it was merely an after-the-fact justification for a retaliatory termination. Indeed, a reasonable factfinder could conclude that if the State Auditor's report were really the culmination of a thorough investigation into Ms. Taft's qualifications, then the report detailing such an investigation would not make an error identifying the position that Ms. Taft had occupied and was allegedly unqualified for. Specifically, the State Auditor's report refers to Ms. Taft's position as "the New Finance Director,"[97] when her title was "Director of Administrative Services," which supervises several divisions, some of which have financial responsibilities. Given that the State Auditor's report was the culmination of months of an ostensibly thorough investigation but yet misses a basic fact, a reasonable factfinder could conclude that this post-hoc report is a slipshod attempt to come up with a non-retaliatory reason for a termination that occurred three months earlier.

In considering the State Auditor's conclusions reached after several months of investigation, a reasonable factfinder would also have to consider that the original reason for terminating Ms. Taft's employment (i.e., going in "another direction") was likewise based on an allegedly thorough investigation. Yet, the conclusions reached from that three-week investigation never said that Ms. Taft was unqualified despite Mr. Wilde having information that such was the case long before Ms. Taft's termination. These potentially conflicting conclusions—both of which were reached after purportedly thorough investigations—could lead a reasonable

---

[97] ECF No. 13-7 at 17 of 29.

factfinder to conclude that the Department's reasons for terminating Ms. Taft's employment are not credible and, therefore, are pretext for retaliation.

>     **2.**    **Ms. Taft's Successful Performance Review Three Weeks Before Her Termination Could Also Show Pretext to a Reasonable Factfinder.**

In addition to the differing reasons for terminating Ms. Taft, a reasonable factfinder could conclude that the favorable employee performance review that Ms. Taft received shortly before her termination is evidence of pretext. Although insufficient standing alone to establish pretext, a favorable performance review proximate to the adverse employment action is evidence that a reasonable factfinder could find probative of pretext.[98] This is especially true when the Department has not cited any change in the status quo between the time Ms. Taft received her favorable performance review and her termination a few weeks later. In other words, a reasonable factfinder could conclude that if Ms. Taft had performed satisfactorily in a job for which she was allegedly unqualified for an entire year up to and including a few weeks before she was fired, then the Department's qualification-based argument is suspect given that her allegedly deficient qualifications had not changed from the time of her favorable review to the day of her termination. Indeed, if Ms. Taft were allegedly always unqualified but performed satisfactorily in that job for the prior year—and nothing changed between her successful performance review and the date of termination—then claiming deficient qualifications as the reason to terminate her employment could undermine the credibility of the Department's explanation in the eyes of a reasonable factfinder. This is especially true where, as here, the reasonable factfinder would be able to consider the Department's post-hoc reasons for

---

[98] *Lewis v. St. Cloud State Univ.*, 467 F.3d 1133, 1137-38 (8th Cir. 2006).

terminating Ms. Taft's employment. Accordingly, the Department's motion for summary

judgment as to Ms. Taft's UPPEA claim is denied so that it may be tried to a jury.[99]

## II.   Mr. Wilde Is Entitled to Summary Judgment Regarding Ms. Taft's Section 1983 Claim.

Ms. Taft cannot overcome Mr. Wilde's assertion of qualified immunity and, therefore, he

is entitled to summary judgment. The defense of qualified immunity provides "immunity from

suit rather than a mere defense to liability" for claims under section 1983.[100] Where, as here, "a

defendant asserts qualified immunity . . . , the burden shifts to the plaintiff to show that: (1) the

defendant violated a constitutional right and (2) the constitutional right was clearly

established."[101] The court has discretion to determine which of the two elements to address

first.[102] As shown below, Ms. Taft cannot show that Mr. Wilde violated the Constitution and,

therefore, Mr. Wilde is entitled to summary judgment.

Ms. Taft cannot establish a constitutional violation because she cannot make a prima

facie case of gender discrimination under the *McDonnell Douglas* framework. Where, as here,

Ms. Taft alleges gender discrimination under section 1983, courts apply the *McDonnell Douglas*

---

[99] *Gatti v. Grander Med. Clinic, P.C.*, 529 F. Supp. 3d 1242, 1257 (D. Utah 2021) ("A plaintiff who offers evidence showing the employer's proffered reason for termination is pretextual creates a triable question of fact as to retaliatory intent.").

[100] *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (emphasis omitted), *modified on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).

[101] *Thompson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009) (quotations and citations omitted).

[102] *Lundstrom v. Romero*, 616 F.3d 1108, 1118 (10th Cir. 2010).

framework as if the cause of action were under Title VII of the Civil Rights Act of 1964.[103] As discussed above, the *McDonnell Douglas* framework contains three parts: (1) the plaintiff's prima facie case; (2) the defendant's non-discriminatory business reason for taking the allegedly discriminatory action; and (3) the plaintiff showing that the defendant's non-discriminatory reason was pretext for discrimination.[104] Because Ms. Taft cannot establish a prima facie case, the court only discusses the first *McDonnell Douglas* element below.

Ms. Taft cannot establish a prima face case of discrimination because she cannot show circumstances that give rise to an inference that her termination from employment was because of unlawful discrimination. Although courts have provided numerous and, at times, seemingly contradictory standards to make a prima facie case,[105] the Court of Appeals for the Tenth Circuit has clearly stated that "[t]he critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred under circumstances which give rise

---

[103] *Drake v. City of Fort Collins*, 927 F.2d 1156, 1162 (10th Cir. 1991) ("[T]he elements of a plaintiff's case are the same, based on the disparate treatment elements outlined in *McDonnell Douglas*, whether that case is brought under §§ 1981 or 1983 or Title VII.")

[104] *See, e.g.*, *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995).

[105] *Compare Perry v. Woodward*, 199 F.3d 1126, 1138 (10th Cir. 1999) (stating that a prima facie case of discriminatory termination requires the plaintiff to show that (1) she belongs to a protected class; (2) she was qualified for her job; (3) despite her qualifications, she was discharged; and (4) the job was not eliminated after her discharge), *with Bennett v. Windstream Comm'cs, Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015) (stating that a prima facie case of discriminatory termination requires the plaintiff to show that (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the circumstances surrounding the challenged action give rise to an inference of discrimination).

to an inference of unlawful discrimination."[106] And regardless of which prima facie articulation the court uses, Ms. Taft has not provided evidence of circumstances leading to the inference of gender discrimination.

In an attempt to make such a showing, Ms. Taft relies on two categories of evidence. First, Ms. Taft contends that Mr. Wilde "frequently told both Ms. Taft and [another female director at the Department that] they were at-will employees and he could fire them at any time . . . [and that Ms. Taft and the female director] were 'unqualified' for their positions and was often condescending."[107] Ms. Taft subjectively interpreted these comments from Mr. Wilde to be motivated by her and her colleague's gender. However, the court "note[s] the remark is gender-neutral on its face and will not, without more, support an inference of discriminatory intent."[108] Indeed, "an isolated and ambiguous comment is generally considered too abstract to support an inference of discrimination. . . . Without more, moreover, an employee's subjective belief in a comment's invidious nature also does not support an inference of discriminatory intent."[109]

Second, Ms. Taft relies on remarks that Mr. Wilde made in an interview for Ms. Taft's replacement *after* Ms. Taft's employment had been terminated. After one of the interviews, Mr. Wilde stated, "There's one problem, she's a young female."[110] When a female interviewer

---

[106] *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1151 (10th Cir. 2008) (quotations and citations omitted).

[107] ECF No. 16 at 21 of 25.

[108] *Adamson*, 514 F.3d at 1151.

[109] *Id*.

[110] ECF No. 16-13.

courageously sought to correct her supervisor by pointing out that the candidate's gender is not a relevant factor, Mr. Wilde obliquely replied: "[I]t's all about perception."[111] Ms. Taft contends that this shows Mr. Wilde was biased against young females then and, therefore, was biased against a young female like Ms. Taft while she was employed at the Department.

The problem with Ms. Taft's argument, however, is that these remarks do not establish a sufficient nexus to *her* to be probative of discriminatory intent in her case. "Normally, post-termination statements, memos, letters, etc., which are not probative of the employer's pre-termination mental state and which did not affect the decision to terminate are immaterial."[112] However, courts have allowed a plaintiff to rely on post-termination statements from an employer to show discriminatory intent when there is a specific nexus between the post-termination statement and the now terminated employee.[113] For example, in *Quigg v. Thomas County School District*, the school district refused to renew a female assistant superintendent's contract.[114] Immediately after voting not to renew the employment contract, one

---

[111] *Id*.

[112] *Tennes v. Mass. Dep't of Revenue*, 944 F.2d 372, 378 (7th Cir. 1991).

[113] *Quigg v. Thomas Cnty. Sch. Dist*., 814 F.3d 1227, 1241-42 (11th Cir. 2016); *Thompson v. UHHS Richmond Heights Hosp*., 372 F. App'x 620, 626 (6th Cir. 2010) (considering post-termination statements where employer said that he was going to get rid of "troublemakers" while pointing to African-Americans and then said that the plaintiff was a "troublemaker"); *Neufeld v. Searle Lab'ys*, 884 F.2d 335, 338, 340-41 (8th Cir. 1989) (considering post-termination statements where supervisor stated in a staff meeting one month after the plaintiff was allegedly terminated based on age that the supervisor's objective was to "get rid of" old people).

[114] *Quigg*, 814 F.3d at 1233-34.

of the board members said, "[I]t is time to put a man in there."[115] Given the nature of the vote and the sexist statement's proximity thereto, the court found that the post-termination statement could be considered to show discriminatory intent.[116] Thus, in order for a post-termination statement to be relevant to establish discriminatory intent, there must be some textual and temporal indicia that the post-termination statement is connected to the reason for firing the plaintiff.

Ms. Taft cannot make that showing here. Mr. Wilde's statements in the post-termination interview of another candidate for the DAS are too general to establish a nexus between those statements and Mr. Wilde's intent vis-à-vis Ms. Taft. The text of the statements does not establish a nexus that the reason Mr. Wilde terminated Ms. Taft was because she was female. Had Mr. Wilde said something akin to, "There's one problem, she's a young female *just like our last DAS*," then a clear textual nexus would be present. However, that is not what the evidence shows. Thus, the post-termination statements, taken alone or in conjunction with Mr. Wilde's other statements, are insufficient to establish an inference of discrimination. Instead, all Ms. Taft has proven is: (1) I am female; (2) my employment was terminated; and (3) therefore, my employment was terminated because I am a female. A false syllogism such as this is insufficient to establish a prima face case.[117] Consequently, Ms. Taft fails to prove a constitutional violation,

---

[115] *Id.* at 1241.

[116] *Id.* at 1241-42.

[117] *Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 836 (6th Cir. 1996) (holding that the false syllogism that: "A) My coworkers hate me; B) I am old; C) My coworkers hate me because I'm old" is insufficient to establish a prima facie case of discrimination).

and, accordingly, Mr. Wilde is entitled to qualified immunity and summary judgment on Ms.

Taft's section 1983 claim.

<u>**CONCLUSION AND ORDER**</u>

As shown above, Ms. Taft's retaliation claim against the Department under the UPPEA

withstands Defendants' motion for summary judgment and is entitled to trial. Therefore,

Defendants' motion as to Ms. Taft's UPPEA claim is DENIED. Within 21 days of this order, the

parties are HEREBY ORDERED to jointly submit proposed dates for trial, which, absent a

showing of good cause, should occur before December 31, 2022.

Because Ms. Taft has abandoned her breach of contract claim against the Department,

Defendants' motion for summary judgment on that claim is GRANTED. Likewise, because Ms.

Taft abandons her claims under section 1983 against the Department and Mr. Wilde in his official

capacity, Defendants' motion for summary judgment as to those claims is GRANTED. Finally,

because Ms. Taft's section 1983 claim fails to overcome Mr. Wilde's qualified immunity,

Defendants' motion for summary judgment on Ms. Taft's section 1983 claim against Mr. Wilde

in his individual capacity is GRANTED.

IT IS SO ORDERED.

DATED this 19th day of August 2022.

BY THE COURT:

JARED C. BENNETT
United States Magistrate Judge

32